**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**Case No. 0:15-cv-60185-WJZ**

FORT LAUDERDALE FOOD NOT BOMBS, NATHAN PIM, JILLIAN PIM, HAYLEE BECKER, and WILLIAM TOOLE,

Plaintiffs,

v.

CITY OF FORT LAUDERDALE,

Defendant.
_______________________________/

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Plaintiffs hereby move this Honorable Court to enter summary judgment for the Plaintiffs. As grounds for this Motion, Plaintiffs state:

1. Plaintiffs Fort Lauderdale Food Not Bombs, Nathan Pim, Jillian Pim, Haylee Becker and William Toole (hereafter collectively "Fort Lauderdale Food Not Bombs" or "FFNB") bring this action for declaratory and injunctive relief and damages against Defendant City of Fort Lauderdale (City) pursuant to 42 U.S.C. § 1983 for past and ongoing injuries to their rights guaranteed by the First and Fourteenth Amendments of the U.S. Constitution.

2. Plaintiffs Nathan Pim, Jillian Pim, Haylee Becker, and William Toole are residents of Broward County and political organizers with FFNB, an unincorporated association affiliated with the grassroots international Food Not Bombs movement that works for non-violent social change through direct action.

3. FFNB holds weekly demonstrations that involve sharing free food with others

at Stranahan Park, a traditional public forum in the City, to communicate the political message that food is a human right, not a privilege, and that our collective societal resources should be redirected from supporting the military to providing food for all who are hungry. The group does not serve food as a charity, but as an act of solidarity with others meant to convey that all persons are equal, regardless of socio-economic status, and that everyone should have access to food as a human right.

4. In October 2014, the City enacted an ordinance, Number C-14-42, amending Section 47-18.31 of the City's Unified Land Development Regulations (ULDR). The City's amendments to Section 47-18.31 revised the definition of Social Service Facility to include, *inter alia*, an "Outdoor Food Distribution Center." (Doc. 1-3.)

5. The City prohibits "Outdoor Food Distribution Centers" unless an individual first applies for and receives a zoning permit. (Doc. 1-3, at 7-10.)

6. When the City enacted Ordinance C-14-42, it resumed enforcement of Park Rule 2.2 which bans social services in City parks, defined as the provision of food to persons "in order to meet their physical needs." (Doc. 1-4, at 1.)

7. The Ordinance and Park Rule operate to ban "Outdoor Food Distribution Centers" in all City parks and on all City sidewalks in the City. Even if a zoning permit could be issued for a particular public park, the City's procedures for obtaining a permit are burdensome, expensive, time-consuming, and allow for covert discrimination by granting City officials unbridled discretion in determining whether a zoning permit is required and under what circumstances such a permit will be granted.

8. Although Plaintiffs are not sharing food as a "social service" but as an act of solidarity and political protest, the City has applied the Ordinance and Park Rule 2.2 to

effectively ban Plaintiffs from engaging in First Amendment expressive activities in all traditional public fora in the City.

9. Since the Ordinance took effect on October 31, 2014, FFNB has continued its weekly demonstrations at Stranahan Park. The City, through its police department, has enforced both the Ordinance and Park Rule against members of FFNB through citations and arrest. Plaintiffs fear future harassment, arrest and prosecution for continuing to engage in their weekly demonstrations at Stranahan Park.

10. The Ordinance and Park Rule are unlawful prior restraints and the regulations infringe on Plaintiffs' freedom of expression and association guaranteed by the First Amendment and due process rights guaranteed by the Fourteenth Amendment.

**WHEREFORE**, Plaintiffs respectfully request that the Court GRANT their Motion for Summary Judgment, enter declaratory judgment, and issue a permanent injunction prohibiting the City from enforcing Section 47-18.31 and Park Rule 2.2 of the City Code, and provide any other relief that is just and proper.

## MEMORANDUM OF LAW

Plaintiffs meet the legal standard for granting summary judgment. Summary Judgment is proper if the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In addition, Plaintiffs satisfy the four necessary elements for a permanent injunction: (1) success on the merits; (2) likelihood of irreparable harm unless the injunction is issued; (3) the balance of equities tip in Plaintiffs' favor as the threatened injury outweighs whatever damage the proposed

injunction might cause the non-moving party; and (4) the injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

## I. The undisputed facts demonstrate defendant has violated Plaintiffs' First and Fourteenth Amendment rights guaranteed by the U.S. Constitution.

### A. First Amendment - Freedom of Expression.

The City's Ordinance and Park Rule are being applied to prohibit Plaintiffs' weekly political demonstrations in Stranahan Park, a public park located in the downtown area of the City of Ft. Lauderdale, which the City agrees is a traditional public forum. (Facts ¶ 9). Traditional public forums "'occupy a special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014). The government's ability to restrict speech in such locations is "very limited." *Id.*

#### 1. Plaintiffs' weekly demonstrations at Stranahan Park are protected by the First Amendment.

Plaintiffs' political demonstrations at Stranahan Park involve food sharing as expression of and in furtherance of the very message conveyed by their group's name: society needs to change so that our collective resources are spent on food for all, not bombs and war. (Ex. 23 ¶ 5, 13; Ex. 25 ¶ 7; Ex. 26 ¶ 7; Ex. 27 ¶ 13.) (Facts ¶¶ 1, 2.) Plaintiffs' demonstrations relate to political messages about war, poverty and hunger, which are broad political and social issues of interest and public concern of society at large which occupy the "highest rung on the hierarchy of First Amendment values and are entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

Plaintiffs' conduct is "sufficiently imbued with elements of communication to fall

within the scope of the First and Fourteenth Amendments." *See Spence v. State of Wash.*, 418 U.S. 405, 409 (1974). To determine whether conduct contains sufficient elements of communication, the Court asks: (1) whether there is an "intent to convey a particularized message"; and (2) whether "the likelihood was great the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). The "nature of [Plaintiffs'] activity, combined with the factual context and environment in which it was undertaken" demonstrate that Plaintiffs are engaged in a form of protected expression. *Spence*, 418 U.S. at 409-410; *see also First Vagabonds Church of God v. City of Orlando*, 638 F.3d 756, 760 (11th Cir. 2011) (assuming, without deciding, that feeding of homeless persons by Orlando Food Not Bombs in public parks is expressive conduct entitled to some protection under the First Amendment). Courts also consider whether the conduct is "inherently expressive." *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006).

**a. Food Not Bombs intends to convey a particularized message by sharing food as symbolic expression of its political message.**

By sharing food in Stranahan Park every Friday at their weekly demonstrations, FFNB intends to convey a particularized message that food is a human right, not a privilege. (Ex. 23 ¶ 5; Ex. 25 ¶ 7; Ex. 26 ¶ 7.) Food Not Bombs does not serve food as a charity, but instead as an act of solidarity with others meant to convey that all persons are equal, regardless of socio-economic status, and that everyone should have access to food as a human right. (Ex. 23 v7; Ex. 24 ¶ 8; Ex. 26 ¶¶ 6, 7.) *See Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1328 (M.D. Fla. 2011) (simulation of "occupation" of public park through tenting and sleeping is symbolic conduct intended to be

communicative); *see also Monroe v. State Court of Fulton Cnty.*, 739 F.2d 568 (11th Cir. 1984) (flag burning during a public demonstration concerning U.S. involvement in Iranian affairs demonstrates intent to convey a particularized message of dissatisfaction with the government's policies).

Food sharing in the context of Plaintiffs' political demonstrations is akin to the protected expression of a parade or a protest march:

> If there were no reason for a group of people to march from here to there except to reach a destination, they could make the trip without expressing any message beyond the fact of the march itself... [W]e use the word "parade" to indicate marchers who are making some sort of collective point, not just to each other but to bystanders along the way... Parades are thus a form of expression, not just motion, and the inherent expressiveness of marching to make a point explains our cases involving protest marches.

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995). Just as the purpose of a parade is not just to reach a destination, food sharing by FFNB during its political demonstrations is not just for the purpose of meeting physical nutritional requirements necessary for survival, but to make a collective political point to each other and to other people who view their demonstration. (Ex. 24 ¶¶ 6, 7; Ex. 25 ¶ 11.) The group's political message is communicated not only through words, but through the symbolic act of gifting food, with no expectation of money or other reciprocity, to demonstrate that ending hunger is as simple as sharing food with those who are in need. (Ex. 23 ¶ 7; Ex. 24 ¶¶ 6, 7, 9; Ex. 28 ¶ 27.)

**b. The likelihood is great that the message would be understood by those who viewed it.**

The likelihood is great that the message conveyed by FFNB would be understood

by those that viewed it. The test is an objective one, requiring the Court to ask "whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphasis in original). In *Holloman*, the court found that a student raising his fist during the Pledge of Allegiance "clearly expressed a generalized message of disagreement or protest," and "even if students were not aware of the specific message Holloman was attempting to convey," his conduct was expressive and protected by the First Amendment. *Id.* at 1270.

The Court examines whether "the nature of [plaintiff's] activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that he engaged in a form of protected expression." *Spence*, 418 U.S. at 409-10; *See also Johnson*, 491 U.S. at 406 (examining factual context of flag burning as culmination of political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Regan for President to determine it was sufficiently expressive); *Monroe*, 739 F.2d at 572 (because flag burning occurred during demonstration that involved picketing and speeches, the likelihood was great that message would be understood by those who viewed it).

The factual context and environment in which food sharing takes place lead to the conclusion that a reasonable person would infer some sort of message. At its weekly demonstrations, Ft. Lauderdale Food Not Bombs sets up a folding table under a gazebo in Stranahan Park to place vegetarian or vegan food items that were donated or prepared by volunteers. (Ex. 23 ¶ 12.) There is a banner with the name of the group "Food Not

Bombs" and the group's logo (a human fist closed around a carrot) along with literature or flyers that members pass out with political messages about the group's mission and other issues of public concern. (Ex. 23 ¶¶ 6-7; Ex. 24 ¶ 6.) The demonstration is in a public park, is not an exclusive event, corded off or limited to individuals by invitation, and any member of the public who passes by is invited to participate including through messages on signs or banners. (Ex. 25 ¶¶ 10-11.) The demonstrations sometimes also include music, puppet shows, protest chants or other activities to inform the public about human rights issues and to encourage the public to become involved in organizing and taking action for positive social change. (Ex. 23 ¶ 12.)

The very fact of handing out food for free, without restriction, to anyone rich or poor, friend or stranger, communicates their message of solidarity and social unity. (Ex. 23 ¶ 7; Ex. 25 ¶ 11; Ex. 28 ¶ 27.) This message is underscored by the location in which these demonstrations take place: Stranahan Park, a contested public space that has been a battleground in the City's policies to reduce the visibility of homelessness which is a topic of public concern. (Ex. 23 ¶¶ 8-11, 17-18.) *See City of Ladue v. Gilleo*, 512 U.S. 42, 56 (1994) (location of expression can be intertwined with message). Because of the inherently expressive nature of food sharing, and the deep cultural significance it has to every human society (Facts ¶¶ 4-6) a reasonable person would interpret this as "*some* sort of message" if not the "*specific* message" that Food Not Bombs is intending to convey. *See Holloman*, 370 F.3d at 1270.

**c. Food sharing is inherently expressive activity.**

As the Supreme Court has recognized, "symbolism is a primitive but effective way

of communicating ideas." *Hurley*, 515 U.S. at 569 (First Amendment protects symbolic acts such as saluting (or refusing to salute) a flag, wearing an armband to protest a war, and marching in uniforms displaying the swastika). The messages communicated through food, and food sharing, are among the most powerful examples of symbolic expression. (Ex. 28 ¶¶ 11-25.) Just as "[t]he use of an emblem or flag to symbolize some system, idea, institution or personality, is a short cut from mind to mind," *West Virginia v. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943), the sharing and gifting of food is a form of communication, sometimes more profoundly so than speech itself.[1] (Facts ¶ 4.) *See First Vagabonds Church of God v. City of Orlando, FL*, 610 F.3d 1274, 1295 fn.7 (11th Cir. 2010) (Barkett, J., Dissenting) (rehearing en banc granted, opinion vacated by *First Vagabonds Church of God v. City of Orlando, FL,* 616 F.3d 1229 (11th Cir. 2010), and opinion reinstated in part by *First Vagabonds Church of God v. City of Orlando, FL*, 638 F.3d 756 (11th Cir. 2011)) ("[W]ithout any explanation, the majority dismisses the act of sharing food as one that has no history of symbolic expression. However, sharing food has significant meaning both in this country's history (e.g., Thanksgiving) and in major world religions (e.g., Passover in the Jewish tradition, Communion in the Christian tradition).")

Sharing and gifting of food is among the most primordial forms of communication. Food sharing and gifting has been documented among every distinct clan, tribe, language group, ethnicity, and nationality that have been studied by social scientists. Every major religion has shared ritual meals, including food sharing rituals like the Eucharist which are

---

[1] Similarly, both sleeping (in the context of a political demonstration) and nudity (in the context of nude dancing) have found protection under the First Amendment as expressive conduct. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 292 (1984); *City of Eric v. Pap's A.M.*, 529 U.S. 277, 289 (2000).

a form of worship that is intended as a form of communication with the deity. (Facts ¶ 4.)

Sharing food communicates messages of solidarity as it is a social act that brings people together and gives them a common sense of membership and affiliation. Entire countries share similar holiday meals, dishes, and foods that are a powerful means of creating and reinforcing messages of belonging and inclusion. In every human society, refusal to share food is interpreted as a form of aggression or social distance. Sharing food is one of the key forms of communication that has made civilization possible, as sharing a feast is one of the most common ways that human groups settle disputes. (Facts ¶ 5.)

Even though Plaintiffs' food sharing occurs in the context of a political demonstration, the communicative nature of food sharing conveys a message without explanatory speech, which is the hallmark of "inherently expressive" conduct. *See FAIR*, 547 U.S. at 66 (law schools that excluded military recruiters from campus to protest the military's anti-gay policies not inherently expressive because explanatory speech is necessary to explain expressive component of law school's actions). Sharing and gifting of food, where the gift is given freely without any reckoning of value or expectation of return, is a powerful way of establishing relationships, making public and political statements,[2] building virtue, and expressing devotion to principles and ethics. (Facts ¶ 6.) FFNB is engaged in the inherently expressive conduct of food gifting and sharing, which communicates a message of solidarity with those who receive this gift, and is a symbolic

---

[2] For example, in international diplomacy, donations of food are used as a means of asserting power and are often used for the political purposes of asserting positions on human rights, modernity, and religion. (Ex. 28 ¶ 21.)

expression of their political message: ending hunger is as simple as making a collective political decision to give food to people who are hungry. (Ex. 23 ¶ 7; Ex. 24 ¶¶ 6, 7, 9; Facts ¶ 6.)

**2. The City's Ordinance and Park Rules are not valid restrictions on constitutionally protected expression.**

The City has applied the Ordinance and Park Rule to ban Plaintiffs' protected political expression in traditional public fora. (Facts ¶¶ 7-9.) *See Connor v. Palm Beach County*, 1996 WL 438779 *7 (S.D. Fla. May 29, 1996). Expressive conduct may be regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech. *Clark*, 468 U.S. at 293, *citing United States v. O'Brien*, 391 U.S. 367 (1968). The City's Ordinance fails constitutional scrutiny as a time place or manner restriction or as a regulation of symbolic expressive conduct. *First Vagabonds Church of God*, 638 F.3d at 761 (applying time, place or manner test and four factor *O'Brien* test to restriction on large group feedings in city parks); *see also Clark*, 468 U.S. at 298 (four-factor *O'Brien* test for regulation of expressive conduct "is little, if any, different" from the standard applied to time, place or manner restrictions).

The City cannot claim that any governmental interest is served by a zoning permit that bans expressive symbolic conduct - sharing food - that is part of a political demonstration in a traditional public forum. The City is improperly applying zoning laws to regulate the temporary use of public space, effective banning Plaintiffs' political demonstrations from all traditional public fora in the City. This is not only an impermissible use of zoning power; it imposes an unlawful prior restraint on protected First Amendment

expression in any public park in the City. *See infra*, at 13-15. *Shuttlesworth v. Birmingham*, 394 U.S. 147, 152-53 (1969) (unlawful ordinance gave authority to issue parade permits based on broad criteria unrelated to legitimate regulation of public places).

Additionally, the City's Ordinance and Park Rule are not narrowly tailored to meet the City's asserted interests. (Facts ¶¶ 17-21, 25, 27, 32-33.) The City's Ordinance and Park Rule are not a regulation of the "manner" in which a demonstration could be carried out, but instead an attempt to ban food sharing deemed objectionable by the City generally in all city parks. (Facts ¶¶ 17-21, 25, 27, 32-33.) This is in sharp contrast to the regulation upheld by the Supreme Court in *Clark*, where the Court observed that it was permissible for the Park Service to establish certain areas for camping (even assuming sleeping was expressive conduct) because the Park Service "neither attempts to ban sleeping generally nor to ban it everywhere in the parks." *Clark*, 468 U.S. at 295. There is no public place in the City where Plaintiffs are lawfully allowed to engage in their political demonstrations that include sharing food as symbolic expression without being subjected to an unlawful permitting scheme.[3] *See Univ. Books and Videos, Inc. v. Miami-Dade County*, 132 F. Supp. 2d 1008 (S.D. Fla. 2001) (court does not consider parcels of land to be adequate ample alternatives where adult businesses are subjected to unlawful discretionary review

---

[3] This is in contrast to the Orlando ordinance regulating "large group feeding" which was upheld by the Eleventh Circuit Court of Appeals. *First Vagabonds Church*, 638 F.3d at 761-62 (holding there were ample channels of communication because City did not ban large group feedings generally nor ban them everywhere in the parks). Unlike Orlando, which allowed permits for a total of 84 large group feedings a year at parks within the downtown district within a two-mile radius of City Hall and had no restrictions on this activity at any of the other 66 parks located outside the downtown district, the City of Fort Lauderdale has entirely banned Plaintiffs' demonstrations which involve symbolic food sharing because the City deems this a "social service" even if Plaintiffs were to meet all of the requirements in the ordinance. *Id.* (Facts ¶ 32.)

under zoning ordinance prior to operating there).

The Ordinance and Park Rule are being applied in a manner that is impermissibly related to the suppression of expression. Because the Ordinance and Park Rule lack any standards to guide decision-making, City officials are impermissibly granted unbridled discretion to arbitrarily pick and choose among events that require a permit and events that do not by examining the purpose of an event, intent behind sharing food (and with whom), and the content of the message conveyed. (Facts ¶¶ 16, 22, 27-31.) *See infra* at 15-18. *Occupy Fort Myers*, 882 F. Supp. 2d at 1335 (ordinance content based where city official is required to examine the nature of the activity in making a decision to extend park hours). Where, as here, the grant or denial of a permit rests on the "appraisal of facts, the exercise of judgment, and the formation of an opinion, it is content-based and the "danger of censorship and of abridgement of our precious First Amendment freedoms is too great to be permitted." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992). These are unlawful content-based distinctions that are prohibited by the First Amendment and demonstrate how the government's interest is related to the suppression of expression. *See Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015). ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.")

**3. The City's Ordinance and Park Rule 2.2 are unlawful prior restraints on protected expression in traditional public fora.**

The City applied the Ordinance and Park Rule to Plaintiffs' demonstrations at Stranahan Park, citing or arresting members of FFNB for failure to obtain a zoning permit. (Facts ¶¶ 7-8.) The City's Ordinance, as applied to Plaintiffs' constitutionally protected

demonstrations, is a form of prior restraint. *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999) (zoning code which requires zoning exception to operate anywhere in the City makes the exception the equivalent of a license); *See Univ. Books & Videos,* 132 F. Supp. 2d at 1016 (requirement that an adult business, protected by the First Amendment, get discretionary approval at a public hearing to obtain zoning permit makes public hearing the equivalent of a license). As a licensing scheme, the City's zoning Ordinance contains two common defects in unlawful prior restraints on speech: discretion and the opportunity for delay. *Lady J. Lingerie,* 176 F.3d at 1361.

The City's zoning Ordinance impermissibly grants unbridled discretion to City officials in three distinct ways: (1) the City's Zoning Administrator is empowered to determine whether an individual's provision of food under particular circumstances require a zoning permit or not due to vague and imprecise definitions *(infra* at 15-18); (2) if a zoning permit is required, as part of the application process, an applicant is required to receive "written consent" from the landowner which is the City in the case of public parks (similarly, Park Rule 2.2 prohibits sharing food as a "social service" without "written agreement" from the City) without specifying conditions under which consent will be granted; and (3) the discretionary review process for a "conditional use permit" contains criteria that are neither precise nor objective which empower the zoning board to covertly discriminate against Plaintiffs under the guise of "compatibility" or "nuisance" requirements. (Facts ¶¶ 33, 35.) *See Lady J.,* 176 F.3d at 1362 (zoning requirements provide too much discretion and empower zoning board to "covertly discriminate" under guise of "compatibility" restrictions); *see also City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) (licensing

ordinance unconstitutional where there are "no explicit limits" on government official's discretion).

The City's regulations also fail to safeguard against delay as another form of impermissible discretion. *Lady J.*, 176 F.3d at 1361 (ordinance that permits public officials to effectively deny an application by sitting on it indefinitely is invalid). There is no time limit by which the Zoning Administrator must make his decision that a zoning permit applies or not; there is no time limit by which the City must make the decision whether to provide "written consent" under the Ordinance or "written agreement" under Park Rule 2.2; and there is no time limit by which the City must complete its decision-making process on issuing a zoning permit. (Facts ¶¶ 27, 33.) *Solantic, LLC v. City of Neptune Bch.*, 410 F.3d 1250, 1272 (11th Cir. 2005). This Court should therefore find that the City's Ordinance and Park Rule 2.2, as applied to Plaintiffs' political demonstrations in City parks, are unconstitutional prior restraints in violation of the First Amendment.

**B. Fourteenth Amendment-Vagueness.**

This Court should find that the City's Ordinance and Park Rule violate the due process clause of the Fourteenth Amendment because the regulations: (1) grant excessive discretion to City officials to grant or deny permission to engage in protected First Amendment expression, *see Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 822-23 (5th Cir. 1979); (2) fail to provide adequate notice of prohibited conduct, *see City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); and (3) authorize and encourage arbitrary and discriminatory enforcement, *see id.*. Due Process "requires the invalidation of laws that are impermissibly vague." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct.

2307, 2317 (2012).

The Ordinance and the Park Rule lack any criteria at all for implementation of certain requirements of the Park Rule and Ordinance, and thereby are void for vagueness under the Fourteenth Amendment due process clause by granting excessive discretion to, and encouraging arbitrary and discriminatory enforcement by, City officials. *Eaves*, 601 F.2d at 822 ("vague measures regulating first amendment freedoms enable low-level administrative officials to act as censors, deciding for themselves which expressive activities to permit"). The Park Rule requires a "written agreement" to undertake an activity considered to be an otherwise prohibited "social service" under the Park Rule, yet the criteria for this decision are "very subjective" and the decision is made on a "case by case basis." (Facts ¶¶ 25, 27). Similarly, one of the requirements of the Ordinance is that to obtain a zoning permit to operate an "Outdoor Food Distribution Center," one must receive "written consent" from the City to conduct this activity on City property, yet the City has no process in place for determining whether to grant "written consent," and such a decision would be entirely within the discretion of the City Manager or his designee. (Facts ¶¶ 21-22).

The discretion afforded by the City's Ordinance and Park Rule also allows the City to be arbitrary in applying the terms "social service," "public welfare and health," and "physical needs" to determine whether food is being furnished for an impermissible reason, as opposed to food being shared as part of socializing among church members or family members, or for business marketing purposes, purposes which the City allows. (Facts ¶¶ 27-31.) Some of the Ordinance definitions are vague. For instance, the City's definition also fails to specify how many "meals" must be provided to "members of the public" prior

to being considered an "Outdoor Food Distribution Center." (Facts ¶ 14.) The City's Zoning Administrator admits the Ordinance could apply to the provision of food to as few as one individual. (Facts ¶ 18.)

The City has not banned all outdoor events that involve the provision of food through its zoning ordinance and the Zoning Administrator, in his discretion, has allowed a number of events that involve the provision of free food to proceed without the need for obtaining a zoning permit. (Facts ¶¶ 30-31.) For example, City officials had concern that a social services zoning permit would be required for a church hosting a "Friends and Family Cookout" because of the description of the event ("opportunity to reach the less, the lost, and those who may feel left out") and who was invited to the event ("community outreach to the community at large.") After clarifying to the City that homeless people were not invited to the event, the church agreed to change the description of the event to specify it was for fellowship of church members and their families. Due to the change, a zoning permit was not required. (Facts ¶ 31.)

By contrast, the City is using the definition of "social service" in the Ordinance and Park Rule to apply to Plaintiffs' political demonstrations which involve food sharing with members of the public in Stranahan Park even though Plaintiffs are sharing food as a political protest and are not distributing food as a charity. (Facts ¶ 1-3, 7-8.) Neither the church picnic nor the Plaintiffs' weekly demonstrations have as their intended purpose providing food as a social service. The difference between the two events is that Plaintiffs invite everyone to have a place at their table, including homeless people. The Ordinance and Park Rule empowers City officials to pick and choose between food sharing that is authorized and food sharing that is prohibited based on imprecise and unascertainable

standards.

### C. First Amendment– Association.

The City's Ordinance and Park Rule, as applied to Plaintiffs' political demonstrations in Stranahan Park, infringe on Plaintiffs' right to expressive association in violation of the First Amendment. Implicit in the First Amendment is a "corresponding right to associate with others in pursuit of a wide variety of political, economic, educational, religious, and cultural ends." *Roberts v. Jaycees*, 468 U.S. 609, 622 (1984). "[T]he freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion," is a fundamental right and "entitled to special protection" where the "purpose of the association is [as here] to engage in activities independently protected by the First Amendment." *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994). Infringements on the right to expressive association may only be justified by regulations adopted to serve compelling state interests, unrelated to suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms. *Id.* at 623 (citations omitted).

The right to expressive association is implicated by Plaintiffs' demonstrations which are activities protected by the First Amendment. The City has violated Plaintiffs' right to expressive association because it has, through the Ordinance, placed an unlawful prior restraint and unreasonable regulation on Plaintiffs' ability to engage in protected expressive activity with others in any public fora in the City. *See supra* at 13-15. None of the City's purposes for the Ordinance provide any compelling state interest that would justify such a regulation that prohibits certain persons from associating with others in public spaces. (Facts ¶ 23.) *See, e.g., McCullen*, 134 S. Ct. at 2535-36.

The City scrutinizes who is associating with whom to apply the Ordinance and Park Rule definitions concerning what is a "social service" and determine if a violation has occurred. (Facts ¶¶ 30-31.) The City's subjective and arbitrary enforcement of the regulations infringes on Plaintiffs' association with others by denying Plaintiffs the opportunity to share FFNB' political message with people they do not know and, thereby, engage in political advocacy with others to build the Food Not Bombs movement. (Ex. 24 ¶ 11.) Also, sharing food is a particularly powerful and meaningful form of expression that brings people together and provides a sense of affiliation. (Ex. 28 ¶¶ 13-14, 21.) The government's regulations, which prohibit this expressive associational conduct, infringe on Plaintiffs' expressive associational rights to communicate a political message to demonstration participants and passersby that there should be "Food Not Bombs" by redirecting society's resources from war to feeding people, that food is a human right, and that hunger can be ended by sharing food with those who are hungry. (Ex. 24 ¶ 7.)

**II. Plaintiffs meet the requirements for a permanent injunction.**

As demonstrated above, the undisputed facts demonstrate that the City has violated Plaintiffs' First and Fourteenth Amendment rights and they are entitled to summary judgment as a matter of law. This Court should enter a permanent injunction to prohibit the City from enforcing the Ordinance and Park Rule as the balance of equities tips in their favor. Plaintiffs have demonstrated irreparable injury due to the loss of protected First Amendment freedoms. (Facts ¶¶ 7-8.) *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In contrast to the Plaintiffs' past and continuing harm if the City is not enjoined from enforcing the Ordinance and Park Rule, the City will not suffer injury if it is prevented from enforcing unconstitutional laws that unlawfully restricts the exercise of protected constitutional

freedoms. *Howard & Emro Corp. v. City of Jacksonville*, 109 F. Supp.2d 1360, 1365 (M.D. Fla. 2000). Finally, the protection of constitutional rights is always in the public interest. *Lebron v. Wilkins*, 820 F. Supp. 2d 1273,1292 (11th Cir. 2013) ("perhaps no greater public interest exists than protecting a citizen's rights under the constitution") (citations omitted).

## III. Plaintiffs are entitled to declaratory judgment and damages.

Plaintiffs are entitled to a declaration of their rights pursuant to 28 U.S.C. § 2201. *Medimmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 129 (2007) (declaratory judgment proper regarding constitutionality of statute even where there is no imminent threat of prosecution). Plaintiffs are also entitled to damages for violation of their constitutional rights. *Memphis Cmty. Sch. Distr. v. Stachura*, 477 U.S. 299, 305-08 (1986). The Court should find that Plaintiffs have demonstrated the City's liability for damages, and allow Plaintiffs to prove the amount of damages suffered at trial. (Ex. 23 ¶¶ 22-27; Ex. 24 ¶¶ 9-13; Ex. 25 ¶¶ 12-15; Ex. 26 ¶¶ 8-13.) *See Brown v. Sheriff of Orange Cnty.*, 2014 WL 2722350, at *8 (M.D. Fla. June 16, 2014) (granting partial motion for summary judgment on liability; allowing claims to proceed to trial on issue of damages).

## IV. Conclusion.

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Summary Judgment as the undisputed material facts demonstrate that the City has violated their First and Fourteenth Amendment rights guaranteed by the U.S. Constitution. This Court should enter declaratory judgment and a permanent injunction in favor of the Plaintiffs and find Plaintiffs are entitled to damages in an amount to be determined at trial.

Dated: December 16, 2015.

Respectfully submitted,

*/s/ Kirsten Clanton*

KIRSTEN CLANTON, Fla. Bar No. 17179
Kirsten.clanton@southernlegal.org
JODI SIEGEL, Fla. Bar No. 511617
Jodi.siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Ave.
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)

MARA SHLACKMAN, Fla. Bar No. 0988618
mara@shlackmanlaw.com
Law Offices of Mara Shlackman, P.L.
757 Southeast 17th Street, PMB 309
Fort Lauderdale, Florida 33316
(954) 523-1131
(954) 206-0593 (fax)

ANDREA COSTELLO, Fla. Bar No. 0532991
Andreac@laccf.org
Legal Advocacy Center of Central Florida
1610 S.E. 36th Avenue
Ocala, FL 34471
(352) 482-0179
(352) 482-0181 (fax)

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic mail through the Court's CM/ECF system on all counsel or parties of record on December 16, 2015.

*/s/ Kirsten Clanton*
ATTORNEYS FOR PLAINTIFFS