**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

**Case No: 0:15-cv-60185-WJZ**

FORT LAUDERDALE FOOD NOT BOMBS, NATHAN PIM, JILLIAN PIM, HAYLEE BECKER, and WILLIAM TOOLE,

Plaintiffs,

v.

CITY OF FORT LAUDERDALE,

Defendant.
_______________________________/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 7.5, Plaintiffs Fort Lauderdale Food Not Bombs (FFNB), Nathan Pim, Jillian Pim, Haylee Becker and William Toole (hereinafter collectively "Plaintiffs") hereby respond to Defendant's Motion for Summary Judgment (Doc. 42). As explained herein, the City's Motion for Summary Judgment should be denied because (1) Plaintiffs are engaged in expressive symbolic conduct protected by the First Amendment; (2) the City's Ordinance C-14-42, Unified Land Development Regulations (ULDR) § 47-18.31, and Park Rule 2.2 are unlawful prior restraints and invalid time, place, or manner restrictions on expressive activity; and (3) FFNB has organizational standing in its own right to bring this action.

## I. Standards for Granting Motion for Summary Judgment.

The parties are in general agreement as to the standards for granting a motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Doc. 42, at 2-4.) Although

Defendant's Motion is styled as one for final summary judgment (not partial), Defendant fails to move for summary judgment on Plaintiffs' Second Claim for Relief under the Fourteenth Amendment (Doc. 1, at 27-28) and does not address Plaintiffs' allegations that the City has violated their right to expressive association under the First Amendment (*Id.* ¶¶ 88-89). Therefore, the merits of these claims are not addressed in this Response because Defendant did not move for summary judgment on these grounds.[1] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (moving party bears initial responsibility of informing the district court of the basis for its motion and meeting procedural requirements of summary judgment rule).

## II. Plaintiffs are Engaged in Expressive Conduct Protected by the First Amendment.

As an initial matter, Defendant argues that Plaintiffs are not engaged in expressive conduct protected by the First Amendment. (Doc. 42, at 4-9.) The City does not dispute that Plaintiffs' political demonstration activities involving distribution of literature, displaying signs and posters, and engagement with others on topics which relate to FFNB's reasons for political protest, relate to matters of public concern and are entitled to First Amendment protection. (Doc. 38, at 8-9.) However, Defendant's argument seeks to artificially and incorrectly, as a matter of fact, separate Plaintiffs' symbolic political expression of sharing food from these demonstrations which are intended to communicate the political message of Food Not Bombs: that our society can end hunger and poverty if we redirect our collective resources from the military and war and that food is a human right, not a

---

[1] For the reasons set forth in Plaintiffs' Motion for Summary Judgment, this Court should grant summary judgment in favor of Plaintiffs on these claims. (Doc. 41, at 15-19.)

privilege, which society has a responsibility to provide to all. (Doc. 40-23 – 40-26.) As discussed below, Plaintiffs have established that their weekly political demonstrations at Stranahan Park that include sharing food as symbolic expression to communicate their political message are protected by the First Amendment.

Plaintiffs' demonstrations relate to political messages about war, poverty and hunger, which are political and social issues of public concern and occupy the "highest rung on the hierarchy of First Amendment values and are entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). Plaintiffs' conduct is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *See Spence v. State of Washington*, 418 U.S. 405, 409 (1974).

To determine whether conduct contains sufficient elements of communication, the Court asks: (1) whether there is an "intent to convey a particularized message"; and (2) whether "the likelihood was great the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). The "nature of [Plaintiffs'] activity, combined with the factual context and environment in which it was undertaken" demonstrate that Plaintiffs are engaged in a form of protected expression. *Spence*, 418 U.S. at 409-410; *see also First Vagabonds Church of God v. City of Orlando*, *FL*, 638 F.3d 756, 760 (11th Cir. 2011) (assuming, without deciding, that feeding of homeless persons by Orlando Food Not Bombs in public parks is expressive conduct entitled to some protection under the First Amendment). Courts also consider whether the conduct is "inherently expressive." *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006). Plaintiffs satisfy this test because of the context of their political demonstrations in which the symbolic

expression of sharing food occurs to convey a particular political message and because the symbolism of sharing food in the factual context of their demonstrations is inherently expressive conduct. (Docs. 40-23 – 40-26; 40-28; 40-31; 40-32, at 1, 13-20.)

The intended particularized message conveyed by Fort Lauderdale Food Not Bombs at its weekly demonstrations is that our society can end hunger and poverty if we redirect our collective resources from the military and war and that food is a human right, not a privilege. The act of sharing food is not "incidental" or "secondary"[2] to Plaintiffs' political demonstration - it is a symbolic act as part of a political demonstration to further their message.

The communicative nature of symbolic expression as part of a political demonstration is well recognized. For example, in *Monroe v. State Ct. of Fulton Cnty.*, 739 F.2d 568, 572 (11th Cir. 1984), plaintiff's burning of the American flag during a public demonstration protesting the United States' involvement in Iranian affairs was recognized as "intended to convey a particularized message: her dissatisfaction with the United States's policies." Similarly, in *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1324, 1328 (M.D. Fla. 2011), activists' use of tents and sleeping as a symbolic around-the-clock peaceful "occupation" "to bring visibility to the influence of private money into the nation's political process" and "inform members of the general public on political issues such as social justice and economic equality" was recognized as symbolic expression when taking place as part of a political demonstration. In *Hurley v.*

---

[2] Defendant's argument that Plaintiffs' symbolic expressive conduct is "secondary" or "incidental" to their political demonstrations is incorrect as a matter of fact. (Docs. 40-23 – 40-26; 40-31; 40-32, at 1, 13-20, 37-38.) Nor is this the legal test for whether expressive conduct is protected by the First Amendment.

*Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 568-69 (1995), the Court recognized the symbolic expressive message conveyed by a parade - "marchers moving together making some sort of collective point, not just to each other but to bystanders along the way[.]"

Just as burning flags, occupying tents and holding parades as part of a political demonstration are communicative, sharing food by FFNB during its political demonstrations is not just for the purpose of meeting physical nutritional requirements for survival, but meant by FFNB to make a collective political point to those in attendance and others who view the demonstration. (Docs. 40-23 – 40-26; 40-32, at 1, 13-20.) The group's political message is communicated through its demonstration involving the symbolic act of gifting food, with no expectation of money or other reciprocity, to demonstrate that ending hunger is as simple as sharing food with those who are in need. (*Id.*; Doc. 40-28.)

Contrary to Defendant's assertion, the relevant test is not whether the specific message conveyed is "overwhelmingly apparent" to a reasonable observer. (Doc. 42, at 6.) Plaintiffs are not required to prove, as Defendant implies, that the specific message related to "diversion of military resources is being understood, heard, or appreciated by those they serve." (Doc. 42, at 9.) Instead, the Court asks "whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphasis in original). The Court also examines whether "the nature of [plaintiff's] activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that he engaged in a form of protected expression." *Spence*, 418 U.S. at 409-10; *Monroe*, 739 F.2d at 572 (finding that since flag burning

occurred during demonstration that involved picketing and speeches, the likelihood was great that message would be understood by those who viewed it).

Here, the factual context and environment in which food sharing takes place would permit a reasonable person to infer some sort of message. (Docs. 40-23 – 40-26, 40-31.) At its weekly demonstrations, Fort Lauderdale Food Not Bombs sets up a folding table under a gazebo in Stranahan Park to place vegetarian or vegan food items that were donated or prepared by volunteers. (Doc. 40-23 ¶ 12.) There is a large banner with the name of the group "Food Not Bombs" and the group's logo (a human fist closed around a carrot) along with literature or flyers that members pass out with political messages about the group's mission and other issues of public concern. (Docs. 40-23 ¶¶ 6-7; 40-24 ¶ 6.) The demonstration is in a public park, is not an exclusive event, corded off or limited to individuals by invitation, and any member of the public who passes by is invited to participate including through messages on signs or banners. (Doc. 40-25 ¶ 11.) The demonstrations sometimes also include music, puppet shows, protest chants or other activities to inform the public about human rights issues and to encourage the public to become involved in organizing and taking action for positive social change. (Doc. 40-23 ¶ 12; 40-24 ¶ 11.)

This message is underscored by the location in which these demonstrations take place: Stranahan Park, a contested public space that has been a battleground in the City's policies to reduce the visibility of homelessness, a topic of public concern. (Docs. 40-23 ¶¶ 8-11, 17-18; 40-32, at 21-36.) *See City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994) (location of expression can be intertwined with message). Moreover, the facts demonstrate that the organization's message of solidarity communicated by sharing food with all people, with

no restriction or limitation, is a powerful way to establish relationships as individuals have become members of the group as a result. (Docs. 40-24 ¶ 11; 40-27 ¶¶ 9-13.)

The undisputed facts, including the expert opinion of Dr. Richard Wilk, also support that the sharing or gifting of food is inherently expressive activity.[3] (Doc. 40-28.) Just as "[t]he use of an emblem or flag to symbolize some system, idea, institution or personality, is a short cut from mind to mind," *West Virginia v. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943), the sharing and gifting of food is a form of communication, sometimes more profoundly so than speech itself. (Doc. 40-28 ¶ 2.) "[S]ymbolism is a primitive but effective way of communicating ideas." *Hurley*, 515 U.S. at 569. *See First Vagabonds Church of God v. City of Orlando, FL*, 610 F.3d 1274, 1295 n.7 (11th Cir. 2010) (Barkett, J., dissenting) (rehearing en banc granted, opinion vacated by *First Vagabonds Church of God v. City of Orlando, FL*, 616 F.3d 1229 (11th Cir. 2010), *and opinion reinstated in part by First Vagabonds Church of God v. City of Orlando, FL*, 638 F.3d 756 (11th Cir. 2011)) ("[W]ithout any explanation, the majority dismisses the act of sharing food as one that has no history of symbolic expression. However, sharing food has significant meaning both in this country's history (e.g., Thanksgiving) and in major world religions (e.g., Passover in the Jewish tradition, Communion in the Christian tradition).")

Sharing and gifting of food is among the most primordial forms of communication.

---

[3] *Seeds of Peace Collective v. City of Pittsburgh*, 2010 WL 2165365, *6 (W.D. Pa. May 26, 2010), *vacated in part on other grounds*, 453 Fed. Appx. 211 (3rd Cir. 2011), relied on by the City, is inapplicable here. Unlike the plaintiffs in *Seeds of Peace*, who offered "no facts indicating how feeding hungry demonstrators communicates or expresses any idea or message," here, Plaintiffs have provided ample evidence that they are sharing food as an act of political solidarity and symbolic expression of and to further Fort Lauderdale Food Not Bombs' political message. (Docs. 40-23 – 40-26; 40-32, at 1, 13-20, 37-38.)

(Doc. 40-28 ¶ 11.) Food sharing and gifting has been documented among every distinct clan, tribe, language group, ethnicity, and nationality that have been studied by social scientists. (*Id.* ¶ 12.) Every major religion has shared ritual meals, including food sharing rituals like the Eucharist which are a form of worship that is intended as a form of communication with the deity. (*Id.* ¶ 17.)

Sharing food communicates messages of solidarity as it is a social act that brings people together and gives them a common sense of membership and affiliation. (*Id.* ¶ 13.) Sharing and gifting of food, where the gift is given freely without any reckoning of value or expectation of return, is a powerful way of establishing relationships, making public and political statements, building virtue, and expressing devotion to principles and ethics. (*Id.* ¶ 10, 20-21, 24.) Entire countries share similar holiday meals, dishes, and foods that are a powerful means of creating and reinforcing messages of belonging and inclusion. In every human society, refusal to share food is interpreted as a form of aggression or social distance. (*Id.* ¶ 14.) Sharing food is one of the key forms of communication that has made civilization possible, as sharing a feast is one of the most common ways that human groups settle disputes. (*Id.* ¶ 15.)

FFNB is engaged in the inherently expressive conduct of food gifting and sharing, which communicates a message of solidarity with those who receive this gift, and is a symbolic expression of its political message: ending hunger is as simple as making a collective political decision to give "food not bombs" to people who are hungry. (Docs. 40-23 – 40-26; 40-31; 40-32, at 1, 13-20, 37.) Because of the inherently expressive nature of food sharing, and the deep cultural significance it has to every human society (Doc. 40-

28), a reasonable person would interpret this as "some sort of message" if not the "specific message" that FFNB is intending to convey. *See Holloman*, 370 F.3d at 1270 (finding protected First Amendment conduct where "at least some students would have recognized" student's gesture of raising his fist during the Pledge of Allegiance as a generalized message of disagreement or protest even if they were "not aware of the specific message Holloman was attempting to convey"). Thus, Plaintiffs have established the the food sharing that is part of their demonstrations is expressive conduct protected by the First Amendment. *See, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 736 (1969) (recognizing protected First Amendment expressive conduct of wearing black band of cloth on sleeve to express anti-war message).

## III. The City's Ordinance C-14-42, ULDR § 47-18.31, and Park Rule 2.2 Fail Constitutional Scrutiny as Invalid Restrictions and Unlawful Prior Restraints on Protected Expression.

The City has failed to meet its burden to prove that the Ordinance and Park Rule are reasonable time, place, and manner restrictions on Plaintiffs' First Amendment rights. *See United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of justifying its actions.") Time, place, and manner restrictions on speech are valid only if they are (1) content-neutral, (2) narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels of communication.[4] *Clark v. Community for*

---

[4] Expressive conduct may be regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial government interest, and if the interest is unrelated to the suppression of free speech. *Clark*, 468 U.S. at 298, *citing United States v. O'Brien*, 391 U.S. 367. The four-factor *O'Brien* test is "little, if any, different" from the standard applied to time, place or manner restrictions. *Id.*

*Creative Non-Violence*, 468 U.S. 288, 293 (1984). The City's Ordinance and Park Rule do not satisfy any of these criteria. The regulations are unlawful prior restraints on expressive activity that effectively foreclose all of Plaintiffs' political expression in any traditional public fora.

The City ignores that its Ordinance and Park Rule have all of the hallmarks of unlawful prior restraints that prohibit protected expression in all traditional public fora. *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999) (zoning exception requirement for an adult entertainment establishment was a licensing scheme and thus a prior restraint). The City concedes that the Ordinance and Park Rule function as prior restraints in arguing that Plaintiffs "merely need a permit if they wish to feed or share food with the public outdoors[.]" (Doc. 42, at 16.) The City's Ordinance and Park Rule are invalid because they fail to contain "precise and objective criteria" to guide City officials in determining whether to grant or deny a permit." *Lady J. Lingerie*, 176 F.3d at 1361 (licensing ordinance that gives too much discretion to public officials is invalid). A licensing scheme that is invalid on these grounds is "inherently inconsistent with a valid time, place and manner restriction because such discretion has the potential for becoming a means of suppressing a particular point of view." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150-53 (1969).

The undisputed facts demonstrate that for Plaintiffs to get a zoning permit under Ordinance C-14-42, the City's permitting process allows government officials on City boards unfettered discretion in decision-making about whether to grant or deny a zoning permit; the cost is $6,000; and there is no required time frame by which government

officials must make a decision whether to grant or deny a permit. (Doc. 39 ¶¶ 17-22, 24-36.) As a part of the conditions for meeting the zoning permit requirements, the Ordinance and Park Rule impose the additional unlawful requirements to obtain "consent" or "written agreement" from the City (i.e., the property owner) to hold their demonstration in any traditional public forum, but the City has established no criteria by which consent may be provided. (*Id.*) *See Lady J. Lingerie*, 176 F.3d at 1362 (zoning requirements provide too much discretion and empower zoning board to "covertly discriminate" under guise of "compatibility" restrictions); *see also Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 769-70 (1988) (licensing ordinance unconstitutional where there are "no explicit limits" on government official's discretion).

The record demonstrates the type of arbitrary application caused by the unfettered discretion granted to City officials that is constitutionally impermissible. Because the Ordinance and Park Rule lack any standards to guide decision-making, City officials are impermissibly granted unbridled discretion to arbitrarily pick and choose among events that require a permit and events that do not by examining the purpose of an event, intent behind sharing food (and with whom), and the content of the message conveyed. (Doc. 39 ¶¶ 16, 22, 27-31.) *See Occupy Fort Myers,* 882 F. Supp. 2d at 1335 (ordinance content based where city official is required to examine the nature of the activity in making a decision to extend park hours)*; Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (where the grant or denial of a permit rests on the "appraisal of facts, the exercise of judgment, and the formation of an opinion", it is content-based and the "danger of censorship and of abridgement of our precious First Amendment freedoms is too great to be permitted.")

The City claims several interests for the Ordinance and "objectionable characteristics" it claims are meant to be addressed by this regulation. (Docs. 38 ¶ 11; 42, at 10-17.) None of these interests are furthered by the City's application of its zoning regulations and Park Rule to selectively prohibit Plaintiffs' conduct in all city parks and on all city sidewalks. By contrast, the City has not prohibited serving food at outdoor events generally and has allowed church picnics, businesses offering free samples of food as a marketing campaign, and food truck rallies without subjecting them to these same requirements which shows that the regulations are underinclusive to meet the City's interests and undermine the City's justifications for the Ordinance. *See Carey v. Brown*, 447 U.S. 455, 468 fn. 13 (1980).

The City does not elaborate on how the Ordinance furthers a number of these interests in its Motion, and focuses on food safety as its primary justification.[5] The reliance on food safety is misplaced and factually unsupported. During the City's enforcement actions, the City showed no reliance on this justification; no inquiry was made by police officers as to the requirements purportedly designed to address the City's food safety concerns. (Ex. 1, at 52-53, 56.)

The City contends that its restrictions are narrowly tailored because "the only conduct being regulated is PLAINTIFFS' public outdoor feeding or food sharing - not its demonstration or other First Amendment speech or associational activities." (Doc. 42, at 15). This argument overlooks that Plaintiffs' food sharing is symbolic expressive conduct

---

[5] Plaintiffs note that the list of food safety requirements are merely conditions for granting a permit; therefore, even if Plaintiffs met all of these requirements, they would still be in violation of the Ordinance unless they first applied for and received a zoning permit. (Doc. 40-3, at 28:10-23.)

as part of a political demonstration - which is a direct action protesting war and advocating that access to food should be a human right for all (see discussion *supra*). While the City argues that Plaintiffs can convey their message through other means instead of sharing food (signs, posters, t-shirts, etc.) (Doc. 42 at 12), if Plaintiffs did so, they would not be participating in the direct action that is symbolic expression essential to the Food Not Bombs political movement – since FFNB's food sharing is a form of political protest, not a charitable act. (Docs. 40-23 ¶ 5; Doc. 40-24 ¶ 5; Doc. 40-32; Doc. 40-25 ¶ 11; Doc. 40-26 ¶ 6.)

The regulations challenged here are in sharp contrast to the regulation challenged in *First Vagabonds* (en banc), where the Eleventh Circuit upheld an ordinance regulating "large group feedings", involving 25 or more people, as a reasonable time, place, and manner restriction. 638 F.3d at 759. The Court found that plaintiffs could obtain two permits a year for each of the 42 parks in the Greater Downtown Park District (i.e., a total of 84 group feedings allowed per year within a 2-mile radius of city hall) and an unlimited number of feedings at 66 parks located outside the Greater Downtown Park District. *Id.* at 761-62. ("The City 'neither attempts to ban [large group feedings] generally nor to ban [them] everywhere in the parks.'") Here, the City has entirely banned Plaintiffs' demonstrations in any public fora which involve symbolic food sharing even if Plaintiffs were to meet all the requirements of the Ordinance.[6]

---

[6] Similarly, the other cases relied on by the City to support its claim that the regulations are narrowly tailored are distinguishable because they do not constitute complete prohibitions or require individuals to obtain zoning permits to engage in expressive conduct in traditional public fora. *See Clark*, 468 U.S. at 295 (concerning National Park Service's regulation of sleeping in parks, "the Park Service neither attempts to ban sleeping generally nor to ban it everywhere in the parks"); *Smith v. City of Fort*

In addition, courts have found that content-neutral permitting requirements like the regulations here fail narrow tailoring where very small groups engaged in protected First Amendment activity are subject to a permitting process. (Doc. 40-3, at 107:4-22) (no stated minimum number of people in either regulation to trigger requirement for permit). *See Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1255 n.13 (11th Cir. 2004) (striking permit requirement for demonstration applied to groups of 5 or more people); *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) (ordinance lacks narrow tailoring because two or more persons walking on a public right of way with a common purpose or goal required to obtain a permit).

The Ordinance and Park Rule also fail to provide Plaintiffs ample alternative channels of communication. The City contends that there are "numerous zoning districts" where Plaintiffs can obtain a conditional use permit to conduct their food sharing demonstrations, and one zoning district labeled "heavy commercial/light industrial business" where Outdoor Food Distribution Centers are a "permitted" use (Doc. 42 at 15-16). However, this argument is contradicted by the facts.

The City admits that it would never issue a zoning permit for any outdoor food sharing for any City park or City sidewalks. (Docs. 1-3, at 8; 1-4, at 1; 40-1, at

---

*Lauderdale*, 177 F.3d 954, 956-957 (11th Cir. 1999) (upholding park regulation banning begging along a 5-mile stretch of Fort Lauderdale beach as narrowly tailored, where "suppression of begging in the Fort Lauderdale Beach area is materially mitigated by the allowance of begging in streets, on sidewalks, and in many other public fora throughout the City"); *Naturist Society, Inc. v. Fillyaw*, 858 F. Supp. 1559, 1569 (S.D. Fla. 1994) (regulation banning signs, exhibits, and displays in a state park was not narrowly tailored, since signs and displays could have been allowed in certain areas of the park, such as parking and concession areas, where the government's interest in maintenance of the natural environment would not be adversely affected).

112:14-113:13; 40-3, at 19:18-20:6, 28:24-30:7, 123:5-11, 126:9-127:22; 40-16, at 1.) Even if a zoning permit could be obtained for a city park, the permitting process is highly discretionary and as such cannot be considered an ample alternative. *Lady J. Lingerie*, 176 F.3d at 1361 (discretionary zoning permit process is equivalent of a license and does not count as reasonable alternative location for speech in First Amendment scrutiny of zoning ordinance). In addition, to obtain any type of zoning permit to conduct a demonstration that involves sharing food in a City park or other public City property, Plaintiffs would also have to obtain a "written agreement" from the City pursuant to Park Rule 2.2. Because there are no objective criteria for such written agreements, this discretionary permitting process cannot be considered an ample alternative channel of communication. *See Occupy Fort Myers,* 882 F.Supp. 2d at 1334 (regulation did not leave open ample alternatives for protected expression where any parade or procession on a public street or open-air public meeting on public property was subject to discretionary police permit process to occur). Consequently, the City's Ordinance and Park Rule are invalid prior restraints and unreasonable time, place, and manner restrictions.

**IV. Plaintiff FFNB meets the requirements for organizational standing in its own right.**

An organization can have standing in two ways: (1) associational standing to bring its claim on behalf of its members, and (2) organizational standing in its own right. *United Food & Commercial Workers Union Local 751*, 517 U.S. 544, 553 (1996). As counsel for Plaintiffs previously represented to this Court, FFNB asserts only organizational standing

in its own right and not associational standing to bring claims on behalf of its members.[7] (Doc. 24, at 17.) As discussed below, FFNB has Article III standing to assert claims for prospective relief and damages in its own right.

Defendant's argument that FFNB fails to demonstrate that it has Article III standing to sue in its own right lacks merit. (Doc. 42, at 18-20.) The undisputed facts establish that FFNB has proffered evidence of the injury it has suffered as an organization that meets the requirements of Article III standing. To establish standing, an organizational plaintiff must allege injury in fact that is fairly traceable to the defendant's alleged unlawful conduct and likely to be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Contrary to Defendant's argument, FFNB has produced evidence of the injury to itself in this action for the violations of its rights under the First and Fourteenth Amendments based on the City's actions prohibiting the organization from exercising its constitutionally protected rights to freedom of expression and association in public parks.[8] *See Lujan*, 504 U.S. at 561 (when a suit is brought challenging legality of government action by plaintiff who is object of the action at issue, there is "ordinarily little question that the action ... has caused him injury, and that a judgment preventing or requiring the action will redress it").

The City is incorrect in stating that the fact that FFNB has continued its activities under the threat of arrest and citation demonstrates that there is no harm. *See Cate v.*

---

[7] Defendant states that this was based on "informal" communication, but counsel for Plaintiffs also represented this fact to this Court in Plaintiffs' Motion for Protective Order filed on November 17, 2015. (Doc. 24, at 17.)

[8] Defendant's allegation that FFNB "resisted most discovery directed to it" is untrue and unsupported by the record. (Doc. 27, at 2; Doc. 27-1.)

*Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (punishment for exercising First Amendment rights constitutes irreparable injury). The City specifically singled out FFNB for enforcement action under the Ordinance. (Ex. 1, at 34:6-35:19.) Members of FFNB were arrested for violations of the Ordinance at the organization's weekly political demonstrations and criminal prosecutions are ongoing. (Docs. 40-20 ¶ 8; 40-23 ¶¶ 22-26; 40-24 ¶¶ 12-23; 40-25 ¶ 12; 40-26 ¶¶ 10-12.) People who participated in the group's political demonstrations had to assume the risk of arrest and citation, and on November 7, 2014, the organization's political demonstration was shut down and not allowed to continue due to the City's enforcement action. (Ex. 2, at 36:19-37:6, 40:9-41:7, 43:8-21.)

Defendant's enactment and enforcement of the challenged Ordinance and Park Rule 2.2 to prohibit Plaintiffs' weekly demonstrations, which involve the sharing of food, has impaired the organization's ability to engage in its protest activities by forcing the organization to divert resources to counteract Defendant's unconstitutional regulations and enforcement actions. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (an organization has standing to sue on its own behalf if the defendant's illegal acts cause injury by impairing its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts). FFNB has demonstrated that it has diverted both time and resources that would have been directed into its lawful activities related to its core political mission to activities to oppose Defendant's actions in the following ways: (1) dealing with the arrest and citations of its members pursuant to the challenged regulations, including members who have continued to be prosecuted under these laws (Docs. 40-20 ¶ 8; 40-23 ¶¶ 22-26; 40-24 ¶¶ 12-13; 40-25 ¶ 12; 40-26 ¶¶ 10-12; Ex. 2, at 36:19-37:6, 43:25-46:4); (2) educating its members about their rights after the regulations

were passed and attempting to keep its members safe from the risk of arrest (Ex. 2, at 43:8-21); (3) being subjected to two unconstitutional permit schemes (Docs. 40-23 ¶¶ 13-16, 19-21; 40-24 ¶¶ 10-11; 40-25 ¶ 15; 40-26 ¶¶ 8-9); (4) organizing opposition to the City's regulations (pre and post-enactment) including holding demonstrations (Docs. 40-23 ¶ 11, 27; 40-25 ¶ 13; 40-30; Ex. 2, at 37:7-24); (5) attending and speaking at lengthy City Commission meetings concerning Ordinance C-14-42 and its impact on the group's political demonstrations and community members who FFNB associates with as part of its demonstrations (Docs. 40-23 ¶ 27; 40-25 ¶ 13; 40-26 ¶ 13; 40-27 ¶ 12; Ex. 2, at 37:7-24, Exs. 5-6); (6) organizing community forums to educate the public about the regulations challenged in this action and the implications of these laws on people's constitutional rights (Docs. 40-23 ¶ 27; 40-30); and (7) compiling flyers, blog posts, social media communications and other public education materials about the laws challenged in this action (Docs. 40-23 ¶¶ 11, 27; 40-25 ¶ 13; 40-30; 40-32, at 21-36; Ex. 2, at 37:7-24). *See Fla. Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166-67 (11th Cir. 2008) (recognizing a diversion of organizational resources to counteract the defendant's illegal practices is a manifestation of injury to organization's noneconomic goals); *see also Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (finding organizational standing and recognizing injury to group where defendant's illegal acts impaired ability to engage in projects by diverting group's resources to counteract illegal acts and educate their members and volunteers about consequences of the law).

Defendant's argument that FFNB has "benefitted" from the City's passage of the Ordinance misses the mark. (Doc. 42, at 19-20.) The relevant inquiry for purposes of organizational standing is whether FFNB has diverted volunteer time and resources to

oppose the City's challenged actions in this case. It is not relevant that others who are not members of the group may have expressed support of FFNB's activities to counteract the City's unlawful actions. (*See, e.g.*, Doc. 40-33.) Nor does it change the fact that the organization has been diverted from its goals and mission due to the City's actions, nor does it negate that the City's actions have caused injury which has required the organization to take action. (Ex. 3.)

These injuries are traceable to the City's enactment, enforcement, and threat of enforcement, of Ordinance C-14-42 and Park Rule 2.2, and constitute injury to the organization's noneconomic goals for purposes of establishing Article III standing. *Id. See, e.g., Ga. Latino Alliance for Human Rights*, 691 F.3d at 1260; *Bischoff v. Osecola Cnty.*, 222 F.3d 874, 885 (11th Cir. 2000). Further, the organizational Plaintiff's injury is likely to be redressed by the requested declaratory and injunctive relief to declare unconstitutional and invalidate the zoning permit requirement in Ordinance C-14-42 and the permit requirement in Park Rule 2.2, and award damages to remedy the violations of FFNB's rights.

Much of Defendant's argument focuses on an inapplicable analysis for associational standing by an organization bringing claims on behalf of its members. (Doc. 42, at 18-19.) *See Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit); *see also Browning*, 522 F.3d at 1160. Defendant's argument as to whether FFNB possesses the "indicia of

membership" for an entity for purposes of standing in a representative capacity on behalf of its members is only relevant where an organization seeks to establish standing in a representative capacity to assert rights on behalf of its members, not on behalf of itself. *See Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 207-11 (D.D.C. 2007) (examining "indicia of membership" in context of applying *Hunt* factors to determine whether organization had associational standing). The City's argument that FFNB does not have any indicia of a functional equivalent of a traditional membership organization only goes to the test for associational standing, which is not at issue here. *Common Cause/Ga. Billups*, 554 F.3d 1340, 1350-51 (11th Cir. 2009) (declining to apply *Hunt* test for associational standing because was not necessary due to Court's holding that organization had Article III standing to sue on its own behalf). Accordingly, this Court should find that FFNB meets the requirements for organizational standing.

**V. Conclusion**

Based on the foregoing reasons and as stated in Plaintiffs' Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 41) and Exhibits in support thereof, Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment.

**Request for Hearing**

Oral argument is requested to aid the Court in resolving the complex issues of law raised by the parties.

Dated: January 7, 2016

Respectfully submitted,

/s/ Kirsten Clanton
KIRSTEN CLANTON, Fla. Bar No. 17179
Kirsten.clanton@southernlegal.org
JODI SIEGEL, Fla. Bar No. 511617
Jodi.siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)
Attorneys for Plaintiff

MARA SHLACKMAN, Fla. Bar No. 0988618
mara@shlackmanlaw.com
Law Offices of Mara Shlackman, P.L.
757 Southeast 17th Street PMB 309
Fort Lauderdale, FL 33316
(954) 523-1131
(954) 206-0593 (fax)
Attorney for Plaintiff

ANDREA COSTELLO, Fla. Bar No. 0532991
andreac@laccf.org
Legal Advocacy Center of Central Florida
1610 S.E. 36th Avenue
Ocala, FL 34471
(352) 482-0179
(352) 482-0181 (fax)
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic notice generated through the CM/ECF service on January 7, 2016, on all counsel or parties of record.

/s/ Kirsten Clanton
ATTORNEYS FOR PLAINTIFFS